[Civ. No. 5097. First Appellate District, Division Two.—July 24, 1925.]

MARION FIKE, as Administratrix, etc., Respondent, v. SAN JOAQUIN LIGHT & POWER CORPORATION (a Corporation), Appellant.

[1] Negligence — Contributory Negligence — When not Question for Jury.—The question of contributory negligence, like that of negligence, is a question for the jury, and only when the facts are clear and undisputed, and when no other inference than that of negligence or contributory negligence can be drawn from such facts, is the court authorized in withdrawing the question from the consideration of the jury.

1. See 19 Cal. Jur. 719; 20 R. C. L. 166.

[2] ID.—DEATH FROM ELECTRIC SHOCK—VERDICT—EVIDENCE.—In this action for damages for death resulting from an electric shock which deceased received when he came in contact with live electric wires maintained and controlled by the defendant power company on the roof of his employer's premises, the verdict in favor of plaintiff finds ample support in the evidence.

[3] ID.—WARNING SIGNS—NOTICE—QUESTION FOR JURY.—In such action, whether the presence of warning signs upon posts which were some ten feet from the electric wires was sufficient warning, under all of the facts and circumstances in the case, was a question of fact for the jury; and it was, therefore, proper for the court to submit the question of negligence to the jury.

[4] ID.—TRESPASS—LICENSE—EVIDENCE.—In such action, the contention that deceased was a trespasser or a licensee in going upon the roof of his employer's premises, cannot be sustained, where the evidence showed that he was there with the knowledge and consent of the defendant power company and in the performance of his duties as an employee of the owner of the premises, carrying out the orders of his superior; and the fact that deceased ascended a ladder and reached the roof a few minutes in advance of his superior, after receiving the latter's instructions, would not constitute him a trespasser or licensee.

[5] ID.—PREPONDERANCE OF EVIDENCE—INSTRUCTIONS.—In such action, while a part of an instruction that "If the weight of all the evidence in the case tending to prove the facts is of greater weight that the evidence tending to disprove such facts, then the plaintiff has proven such facts by a preponderance of the evidence, and is entitled to a verdict in her favor. Preponderance of evidence is not determined by the number of witnesses," taken alone, was erroneous, nevertheless it cannot be said that it was of any injury to defendant where the trial court instructed the jury that the entire case should be considered together and that all the evidence must be taken into consideration before arriving at a verdict, and in at least two other instructions fully and correctly stated the law with reference to a preponderance of the evidence, and all the instructions, when considered together, fully and correctly state the law applicable to all phases of the case.

[6] ID.—EMPLOYER AND EMPLOYEE—NOTICE—EVIDENCE.—In such action, it was immaterial what instructions the manager of the com-

---

3. Measure of duty of company maintaining electric wires on another's premises, toward trespasser or licensee on such premises, notes, 3 L. R. A. (N. S.) 988; 34 L. R. A. (N. S.) 1094; 52 L. R. A. (N. S.) 600; 14 A. L. R. 1039. See, also, 10 Cal. Jur. 189; 9 R. C. L. 1207.

5. See 24 Cal. Jur. 853; 14 R. C. L. 728.

pany for which deceased worked gave to other employees as to
the danger of coming in contact with the high-tension wires on
the roof of the building, if such instructions were not shown to
have been given to the deceased.

---

(1) 20 C. J., p. 392, n. 82; 29 Cyc., p. 630, n. 48, p. 640, n. 13.
(2) 20 C. J., p. 386, n. 49.    (3) 20 C. J., p. 390, n. 75.    (4) 20 C. J.,
p. 354, n. 73.    (5) 38 Cyc., p. 1778, n. 73, p. 1779, n. 75, 76.    (6) 20
C. J., p. 385, n. 44.

APPEAL from a judgment of the Superior Court of
Fresno County. D. A. Cashin, Judge. Affirmed.

The facts are stated in the opinion of the court.

Lindsay & Conley, W. M. Conley and Philip Conley for
Appellant.

Everts, Ewing, Wild & Everts and Dan F. Conway for
Respondent.

PRESTON, J., *pro tem.*—This is an appeal by the de-
fendant San Joaquin Light & Power Corporation from a
judgment entered against it upon a verdict of a jury in the
sum of $26,000.

Plaintiff brought this action as administratrix of the es-
tate of her deceased husband, R. S. Fike, charging that his
death was due to the negligence of the defendant corpora-
tion.

The facts necessary for a correct understanding of the
questions involved on this appeal, and which are practi-
cally uncontroverted, may be thus briefly stated:

It was stipulated at the trial that deceased died from
an electric shock, which he received on the roof of the
Valley Ice Company's building on the twenty-second day
of March, 1919. The Valley Ice Company, a corporation,
owned and operated a plant for the manufacture of ice,
located about one mile southeast of the city of Fresno. The
ice company's plant was divided into two cement one-story
buildings, of the same height, one of which we shall refer
to as the "old building," and the second as the "new build-
ing." The new building had recently been built to the west
of the old building. In the operation of its plant the ice

company used certain electrical power, furnished by the defendant corporation. This power was furnished by defendant at points inside of said Valley Ice Company's plant. Prior to the erection of the new building the high-voltage wires of defendant had entered the old building at the top of two poles which stood on the west side of the old building. In order to facilitate the construction of the new building, the wires were changed so that they ran to the top of the old building from two poles situated about five or six feet from the northwest corner of the old building. Three electric wires, from thirty to thirty-six inches apart, ran from these last-named poles to the insulators near the northwest corner of the roof of the old building, and through these insulators through the roof to the transformers under the roof, and then to the machinery below. These insulators extended approximately thirty-four inches above the top of the roof and were about ten inches in diameter. The wires entered the insulators on the roof of the old building approximately eighteen inches east of the west side of the old building, and near where the roofs of the old and new buildings meet, and about eighteen inches west of the insulators and wire, and on the roof of the old building was a small cement coping about seven inches in height on the north end and tapering toward the south, along the west side of the old building, to the level of the roof. On the east and south of these insulators and wires was a seven-foot galvanized screen, which ran from the north edge of the old building to the south edge, and thence west to the southwest corner of the old building. On the south side of these insulators, wires and screen was the north wall of another building belonging to the ice company, known as the "condenser house." On the north side of these wires and insulators was the north side of the old building, and there was no screen or barrier on that side, but no access could be gained to the roof on this side except by scaling the wall or by means of a ladder, etc. There was no screen or barrier of any kind on the west side of the wires next to the roof of the new building; in fact, this side of defendant's electrical equipment was entirely exposed, and there was nothing to prevent a person who might be on the roof of the new building from walking directly into these live wires, which carried a current of sixty thousand volts. On

each of the poles, near the ground, on the north side of the old building, were cloth warning signs with the word "Danger" written thereon, and there was another similar sign on each pole about four or five feet above the level of the top of the old building, and about ten feet from where the wires went through the insulators in the roof.

There were two means of access to the roofs of the buildings; one through the condenser room in the old building, directly south of the live wires, and the other by means of a movable ladder reaching to the roof of the new building, which ladder was located on the north side of the new building near the west end thereof.

For some time prior to March 22, 1919, the date of the injury to the deceased, the defendant had been engaged in altering the electrical equipment upon said roof; in fact, a new substation was being constructed upon the west end of the roof of the new building, preparatory to moving the high-voltage wires and equipment from the old building to the new location, so as to enlarge the plant. The defendant had, in the course of this work, bored several holes in and through the roof of the new building in order to anchor its electrical wires and equipment, etc. Three of these holes came through the roof into the room immediately underneath.

It will be borne in mind that the defendant corporation not only owned all of the electrical equipment on the roof of the Valley Ice Company's plant on the date of the injury to deceased, but under an agreement with the Valley Ice Company had agreed to maintain and control all said electrical equipment. On the day of the injury a Mr. Nichols, the foreman in charge of the alterations and installations of the electrical equipment for defendant corporation, requested Mr. Whitney, who was chief engineer of the ice company's plant, to patch up the holes which had been drilled in the roof by defendant, and this Mr. Whitney agreed to do. On this point Mr. Whitney testified as follows: "Q. You may state to the jury what, if anything, Mr. Nichols said to you regarding the patching up of the holes on the roof. A. Mr. Nichols came to me and said he was about through the job and where they had drilled the holes through the roof it neeeded patching up, but as we had cement there and had a man who under-

stood the handling of cement, he asked me if I wouldn't have it done—a short job, as an accommodation to him, and I said yes, we will, and that was all I said to him concerning that.''

These holes referred to by Mr. Nichols were in the roof of the new building, about thirty feet from the dangerous wires, and there was no obstruction, as we have seen, between these holes and the live wires. Mr. Nichols did not inform Mr. Whitney as to the exact location of the holes on the roof. The new equipment or substation on the roof of the new building was not in operation and the current was still passing through the wires on the roof of the old building on the date of the accident.

R. S. Fike, the deceased, was forty-eight years of age, a common laborer, and was a married man with a wife and eight children, and employed by the Valley Ice Company as a common laborer, and unaccustomed to electricity or electrical apparatus of any kind, and had only been employed by the ice company four or five days. On the said twenty-second day of March, 1919, the date he received the injury from which he died the following day, he was doing odd jobs for the Valley Ice Company around its plant on the ground floor. His immediate foreman was a Mr. Stanford. At about 11 o'clock A. M. on the morning of the accident he was engaged in cleaning a large wheel in the engine or condenser room on the first floor of the new part of the ice plant. When Mr. Nichols requested Mr. Whitney to have the holes filled, Mr. Whitney turned to the foreman, Mr. Stanford, and told him to take a man and go up and fill the holes. Mr. Stanford at that time asked Mr. Whitney what man he should take and during this conversation Mr. Fike passed along through the engine or transformer room, where these men were talking, and Mr. Whitney replied "Take this man here," referring to Mr. Fike. Whether Mr. Fike heard the conversation between Stanford and Whitney the evidence does not reveal.

Just what followed this conversation up to the time of the accident can be the best shown by the testimony of Mr. Stanford, Mr. Fike's foreman, which is as follows: Q. Did you know a man named R. S. Fike there? A. Yes, sir. Q. Do you know what he was doing in the forenoon of March 22d? A. He was painting the fly-wheel in the

engine-room. Q. Do you know what time in the forenoon
he finished painting the fly-wheel in the engine-room? A.
Somewhere around eleven o'clock. Q. And did you have
any conversation with him after that? A. Yes, I told him
to come—that Mr. Whitney came to me and told me to do a
job and I told him to come with me and patch up some
roofs. Q. What did Fike do immediately after that, if
anything? A. Why, he came with me and asked me, he
said, 'I have done that job,' and we went into the trans-
former room and started patching up. Q. You went in the
transformer room and started patching up? A. Yes, sir.

Q. What part did you patch up in the transformer
room? A. The roof. Q. The inside of the roof? A. Yes,
sir. Q. Still you were downstairs? A. Yes, sir, down on
the ground floor. Q. In the transformer room? A. Yes,
sir. Q. What did you patch up there? A. The two holes
over the switchboard. Q. And what did Fike patch up?
A. He patched up the one in the alleyway between the
pump room and the transformer room—there is an alleyway
through there and he patched up the roof there. Q. Was
there a hole down in the corner on the inside, who patched
that up? A. I patched that up in the engine room—I mean
in the transformer room. Q. In that far corner of the
transformer room? A. Yes, sir. Q. This is the trans-
former room? A. Yes, sir. Q. And the hole you patched
up was in this corner? A. Yes, sir, that one and the other
one. Q. And where were the others? A. One here and one
there. Q. After Fike and you got through patching the
holes on the inside of the rooms, what time of day was it
then, about? A. It was after lunch when he finished that
hole. Q. What, if anything, did you say to Fike then?
A. I said, 'We will go up on the roof and finish up there,
put some tar, asphaltum, in the holes.' Q. Where did you
go then? A. I told him—to go and get the tar pot. I
says, 'You go one way and I will go the other.' Q. The
tar bucket? A. The tar bucket. He met me in the black-
smith shop with the tar bucket. Q. And you went to the
blacksmith shop? A. He met me at the blacksmith shop.
Q. When you told him about going up on the roof to
patch these holes, where were you standing? A. Inside
of the alleyway between the transformer room and the

pump room. Q. When you went to look for the tar
bucket, which way did you go? A. I think I went to the
left and he came to the right. Q. And he met you where?
A. At the blacksmith shop. Q. What were you doing
there? A. I met him there and I took the tar bucket to
put it up on the forge to melt the asphaltum. Q. Was
there asphaltum in the tar bucket? A. Yes, what we call
tar, asphaltum. Q. And did Fike stay there while you
melted the tar or asphaltum? A. No, he said to me,
'There isn't sufficient in there,' and I said, 'Yes, there
is plenty in there, you will see,' and with that he left me.
Q. What direction did he go? A. He went around straight
ahead and then to the left where we had been working.
Q. Towards the place where you had been working? A.
Yes, sir. Q. And did you, after that, hear any report?
A. I heard a report, sir. Q. What kind of a report? A.
Oh, a kind of report and flash. Q. Now, from the time
that Mr. Fike left you in the forge room, where you had
the tar melting it, from that time until the time you heard
the flash, about how long was that—about what length of
time intervened? A. Why, from two to three minutes. Q.
From two to three minutes? A. Yes, sir. Q. And what
did you do after you heard the flash? A. Why, I run
around there to see what was the matter and somebody
was picking him up in a tarpaulin. I didn't see him
laying down but seen him in a tarpaulin. Q. Did you see
him when he was up on top of the roof? A. I saw him
in the tarpaulin. Q. What is it? A. I saw him in the
tarpaulin. I didn't see him laying down on the roof.
Q. On, in a tarpaulin? A. Yes, or canvas. I saw him up
there but he was in the canvas. Q. You never told him to
go up on the roof, did you? A. I didn't tell him to go
up, nor I didn't tell him to stay down. Q. Did you say
anything to him at all about any high-powered wires on
the roof? A. No, sir. Q. He was working under your
orders? A. Yes, sir. . . . Q. Do you know whether Fike
knew anything about the danger of those high-power
wires? A. I don't think he did. Q. And didn't you and
Fike have a little talk about the danger of those wires?
A. I told him not to touch any wires down there because
they was hot, and he said, 'Don't be afraid, I am scared

of it.' Q. Do you know whether he knew it was electricity that was coming through them? A. I don't know anything about what he knew, but I told him the wires was hot in the transformer room, but I didn't tell him anything about the roof.''

It is the theory of respondent, which was evidently accepted by the jury, that deceased ascended the roof of the new building by means of the same ladder used by the employees of appellant, located near the west end of the new building, and was looking over the entire roof of the new building for holes to be filled, when he came in contact with appellant's high-voltage wire or wires, and therefore in pursuit of his lawful employment when he received the injuries from which he died the following day.

The particular act of negligence relied upon by respondent is that the defendant's wires were maintained in an unguarded, exposed and dangerous position, and without proper warnings or barriers of any kind to prevent employees of the Valley Ice Company from coming in contact with appellant's live wires.

Appellant, by its answer, has denied negligence upon its part, and has affirmatively plead sole negligence on the part of the deceased, Fike, and also contributory negligence on the part of the deceased. The appellant's main contention is "that the evidence in the case shows without question, that the death of Fike was the proximate result of his own negligence, and that a directed verdict should have been given for the defendant.''

[1] With this contention we cannot agree, for it is well settled that the question of contributory negligence, like that of negligence, is a question for the jury, and only when the facts are clear and undisputed, and when no other inference than that of negligence or contributory negligence can be drawn from such facts, is the court authorized in withdrawing the question from the consideration of the jury. (*Studer* v. *Southern Pacific Co.*, 121 Cal. 400 [66 Am. St. Rep. 39, 53 Pac. 942], *Nagle* v. *California Southern R. R. Co.*, 88 Cal. 86 [25 Pac. 1106], *Fernandes* v. *Sacramento City Railroad Co.*, 52 Cal. 45, *Orcutt* v. *Pacific Coast Railroad Co.*, 85 Cal. 291 [24 Pac. 661], *Shade* v. *Bay Counties Power Co.*, 152 Cal. 10 [92 Pac.

62], *Stephenson* v. *Southern Pacific Co.,* 102 Cal. 143 [34 Pac. 618, 36 Pac. 407], *Zibbel* v. *Southern Pacific Co.,* 160 Cal. 237 [116 Pac. 513], and many other cases that could be cited.)

In *Stephenson* v. *Southern Pacific Co., supra,* the court said: "The nonsuit was properly denied. . . . Where facts are admitted or proven, without contradiction, the court will determine whether or not they establish negligence, or show contributory negligence; but where the question is open to dispute, it is one for the jury under proper instructions from the court."

Again, in *Zibbel* v. *Southern Pacific Co., supra,* the court said upon this subject: "It is only where no fact is left in doubt and no deduction or inference, other than that of negligence, can be drawn by the jury from the evidence, that the court can say, as a matter of law, that contributory negligence is established. . . . Even where facts are undisputed, if reasonable minds can draw different conclusions upon the question of negligence, the question is one of fact for the jury."

There is a very wide difference between the inferences drawn, and the conclusions reached, by appellant, from the testimony in this case, and those contended for by respondent, which emphasizes the fact that reasonable minds might reach different conclusions from the same testimony and, therefore, in such case, it is a question of fact for the jury to determine.

[2] We are of the opinion that the verdict of the jury finds ample support in the evidence, when all the facts and circumstances of the case are taken into consideration; and especially when it was shown that the deceased was a common laborer; had only been employed by the Valley Ice Company for four or five days; had never lived in a house that contained electric lights; was entirely ignorant of the high-voltage contained in these wires; that neither deceased nor Stanford, his foreman, were ever upon the roof of the building; the location of the holes had never been pointed out to either of them, and deceased had received no warning of the danger lurking in the live wires on the roof of the building. The holes that deceased had assisted in patching underneath the roof were many feet apart and the holes that

were to be filled on top of the roof did not extend through the roof, and no physical barrier of any kind was placed at any point on either roof which would prevent a person from coming in contact with the high-voltage wires.

[3] It will also be remembered that the defendant company had maintained galvanized iron screens seven feet high on the old building, which completely protected anyone on the roof of the old building from coming in contact with these high-voltage wires, but failed to construct any screen whatsoever between the new building, where the people were working, and these high-power wires. Appellant admits they had no screen or barrier between the roofs of the old and new buildings, and relies wholly upon the warning signs upon the posts which were, as above stated, some ten feet from the wires, as a sufficient warning sign. Whether this was sufficient warning, under all of the facts and circumstances in this case, was likewise a question of fact for the jury. It was, therefore, perfectly proper for the court to submit the question of negligence to the jury.

Appellant seeks to bring this case within the rule laid down in such cases as: *Shade* v. *Bay Counties Power Co.*, 152 Cal. 10 [92 Pac. 62], and *Jacobson* v. *Northwestern Pacific Railway Co.*, 175 Cal. 468 [166 Pac. 3], and similar cases.

In each of those cases the court held that the plaintiff was guilty of contributory negligence as a matter of law. But the facts in those cases are very different in many respects from the facts in the case at bar.

A careful reading of the Shade case will show that he was not engaged in any business; was traveling for pleasure; had been warned and knew of the danger of coming in contact with the live wires; with full knowledge of the dangerous character of the wires heedlessly and recklessly placed himself in a most dangerous position. In fact, Shade was simply attempting a "fool-hardy proposition."

In the Jacobson case, Jacobson was expressly warned of the dangerous character of the platform; there was no occasion for his going upon the platform; he was entirely outside of his duties; was actuated solely by motives of curiosity or for his own convenience; was not in the performance of any duty enjoined upon him by his em-

ployer, but, in strict violation of the instructions of his employer, entered the forbidden zone, and was killed by the high-voltage wires that he had been warned to stay away from.

Likewise, in all the other cases cited by appellant, it appears that the injured party knew of the dangerous character of the coming in contact with the live wires and after knowing such danger, either through forgetfulness or after their duties had been performed, through motives of curiosity or convenience; placed themselves in a dangerous position.

In all those cases cited by appellant, there were at least two elements present, which are missing in the instant case: First, lack of knowledge on the part of Fike of the propensities of electricity and the dangerous character of the high-voltage wires on the roof of the building; second, express warning of the danger incurred in approaching near these heavily charged transmission wires.

[4] It is also contended by appellant "That the evidence shows that deceased was a trespasser or at best a bare licensee in going upon the roof of the Valley Ice Company plant, and that he put himself in the way of an obvious and well-understood danger. Having done so he is guilty of negligence, which bars any recovery by his administratrix, as a matter of law."

It is obvious from what we have already said that we cannot agree with this contention.

On the contrary, it seems to us clearly established from the evidence that deceased had the right to be on the roof of the new building of the Valley Ice Company and was there with the knowledge and consent of appellant and in the performance of his duties as an employee of the ice company, carrying out the orders of his superior, Mr. Stanford, and the jury was amply justified in so concluding, by its verdict.

It is difficult to conceive how Fike could have been a trespasser or a bare licensee in being upon the roof of the building, when he had been expressly directed by his foreman, Mr. Stanford, to go there. Stanford said to Fike just a few minutes before the accident: "We will go up

now on the roof and finish up there—put some tar asphaltum in the holes.''

Mr. Fike certainly would not fall into the class of a trespasser or licensee, simply because he ascended the ladder and reached the roof a few minutes in advance of Stanford, after receiving the instructions above mentioned.

[5] It is next claimed by appellant that the court erred in instructing the jury as to what constitutes a preponderance of the evidence.

A part of the instruction complained of is as follows: "If the weight of all the evidence in the case tending to prove the facts is of greater weight than the evidence tending to disprove such facts, then the plaintiff has proven such facts by a preponderance of the evidence, and is entitled to a verdict in her favor. Preponderance of evidence is not determined by the number of witnesses.

This passage taken alone is, of course, erroneous.

This precise situation was presented in the case of *Ergo v. Merced Falls Gas and Electric Co.,* 161 Cal. 339 [119 Pac. 103], and what the court said there of the situation is applicable here, to wit: "It is obvious that the evidence tending to prove a fact might be so slight that it would fail to satisfy the jury of the existence of the fact, and yet it might be of greater weight than other evidence introduced which would tend to disprove the fact. In such case the fact could not be said to be proven either by a preponderance of the evidence or at all. But this passage cannot be thus taken from the context, nor separated from the other instructions given.''

This passage complained of, above quoted, was contained in an instruction pointing out to the jury the difference between the proof beyond a reasonable doubt, that was necessary to justify a conviction in a criminal case, and the proof by preponderance of the evidence, necessary in a civil case.

The court instructed the jury that the entire case should be considered together and that all the evidence must be taken into consideration before arriving at a verdict, and in at least two other instructions fully and correctly stated the law with reference to a preponderance of the evidence. All the instructions must be considered together, and when so considered they fully and correctly state the law appli-

cable to all phases of the case.  Therefore, we cannot say that the passage from the instructions first quoted was of any injury to appellant.

There is some confusion in the record as to just what instructions were in fact given and refused.  One of the instructions claimed by appellant to have been refused by the court which defined a trespasser and a bare licensee was in fact given.  However, this confusion was eliminated by a stipulation between the respective attorneys after the case was submitted to this court.

[6] It is also contended by appellant that the court erred in rejecting certain evidence offered by appellant. This relates to questions asked of the witness Erskine, who was manager of the Valley Ice Company, relative to whether or not he had given general instructions to the employees of the Valley Ice Company of the danger of coming in contact with the high-tension wires on the roof of the building. Some of the questions were as follows: "Q. What instructions did you give your employee (respondent claims the word should be employees) with reference to electric wire line that may come into the building?"  To this question an objection was interposed by respondent that it was irrelevant, incompetent and immaterial unless it included Mr. Fike.  The court said: "I think it is enough if you show actual instructions to Mr. Fike by someone, that would be enough."  Thereupon the following question was asked: "Q. I will ask you this, were any of your employees ever permitted to go on that roof, unless expressly directed to do so?  A. They had no occasion."

After one or two similar questions were asked of the witness Erskine by appellant's counsel and considerable argument between respective counsel, the court said: "If it was a question of notice, that whatever was said by Stanford would be relevant, by general instructions I don't think it would be relevant on cross-examination."

Thus the court opened the door for appellant to prove, if it could, that any instructions were given to Fike by anyone warning him to look out for the wires on the roof.  It is entirely immaterial what instructions Mr. Erskine gave to other employees if they were not shown to have been given to Fike.  Appellant did not attempt to show that deceased,

Fike, had received any instructions from anyone about the danger of the high-voltage wires on the roof of the building.

Therefore the court's ruling under the circumstances was entirely proper.

After a careful examination of the rather voluminous record we find no substantial error therein.

The judgment is affirmed.

Nourse, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 21, 1925.